All right. Thank you, Counsel. Thank you. The case just argued will be submitted. And we will proceed then to hear argument on the next case on calendar for argument this morning, which is 20-70816, Floriberto Miguel-Lopez v. Pamela Bondi. And we will hear first from Ms. Levesque. Did I pronounce that correctly? Levesque, Your Honor. Levesque. All right. You may proceed when you're ready. Good morning, Your Honors. May it please the Court, my name is Angela Levesque. I represent the petitioner Floriberto Miguel-Lopez. I'd like to reserve three minutes for rebuttal. Your Honors, this case should be remanded because the agency applied the wrong legal standards to establish the established record. I'd like to talk about the exception to the asylum filing deadline, the past persecution and nexus arguments, and then I'd like to discuss the due process violations because of the transcription and videoconference errors in the hearing, as well as the BIA's failure to rule on the motion. Would you mind just jumping to your cat relief argument first and tell us what you consider to be your best argument in support of that? Admittedly, that perhaps is not the strongest argument the petitioner has. However, in terms of the cat argument, I believe there was evidence to the fact that there can be torture to individuals in the petitioner's group if he's returned. There was some evidence submitted on the record regarding all of that. But admittedly, that is perhaps not the strongest. All right, thank you. Regarding the agency applying the wrong legal standards to the asylum filing deadline, however, the immigration judge, if we look at his decision, he indicates that to establish changed circumstances, the petitioner would have needed to testify that he had no fear of losetas when he entered the U.S. in 2006 and then only feared them later. But that's not the law. That's not the standard that should be applied. Changed circumstances do not require a brand new conflict or a sudden emergence of fear. And that's in Vihora v. Holder. In that case, this court has held that applicants can wait until later developments materially increase the risk and make an asylum claim more viable. And that's what happened here. The petitioner testified, yes, that he was scared of losetas when he left Mexico. But after he left, the danger intensified more. The record does show this. The record shows that there's increasing cartel violence, specifically of losetas. In fact, I think they were even talking about losetas expanding their territory even into Guatemala. That's corroborated by the Department of State reports and even acknowledged by the immigration judge. And then, of course, in 2013, the record shows that the petitioner's father was violently attacked. So again, that happened after the petitioner left. So there is a change of circumstances. This does fit squarely into that exception. Secondly, going to now withholding of removal, the agency improperly found that harm did not rise the level of past persecution. We do have undisputed facts here. Multiple encounters with losetas. In 1993, the petitioner at age 16 was approached by armed members of losetas. They confronted him, shoved him, and basically said join or die. Then in 1998, they once again confronted him, this time demanding monthly payments and robbed him. Then lastly, in 2013, individuals believed to be losetas broke into the petitioner's father's home, violently beat the petitioner's father, and asked, where is Miguel? Where's the petitioner? This court has held that. Would you address the argument that those were really three isolated incidents and so there's substantial evidence to support the BIA decision? I think there's a link to that in all of those instances. We have individuals claiming to be losetas. That's not been contested. Sure, there's some time that has passed, but in each instance, the petitioner went back to his hometown and he was personally attacked twice. One at age 16 and again in 1998 by losetas. Then again, losetas came in and attacked the father personally. Because some time has passed, I don't think that that necessarily means that it is not linked. Again, we have specific and menacing threats combined with violent or near-violent confrontations that can constitute persecution. And of course, we should look at these things cumulatively. So I think that that's what I'm arguing here in addressing those three separate incidents. It's a cumulative thing. Here we have threats, join or die. We have pay or die. We have confrontations at gunpoint. We have physical aggression, robbery, and violence directed towards a family member. I did want to note that the immigration judge made an error in dismissing the attack on the petitioner's father simply because the petitioner was not present. Again, this court has recognized that violence against family members if connected to the threat is considered persecution. So I think taken together, we do see that the harm does rise to the level of persecution. Next, I do want to talk about nexus. I think that the agency overlooked the circumstantial evidence in addressing nexus. Importantly, I want to look at the social group. Pardon me. The agency acknowledged that the core social group is indigenous Mexican men. And the immigration judge specifically said that that is a cognizable or maybe a cognizable particular social group. Prior counsel did add other elements, having children. We see a lot of these cases where, you know, they're worried about gang activity and, you know, the agency will look at the circumstances of the case and then make a conclusion that you're really worried about general lawlessness in Mexico. And they're not coming after you because you're in this particular group. They're coming after you because they're thugs who go after anyone who's available to them. And we have to review that deferentially. So how can we say that substantial evidence doesn't support the determination that this is due to general lawlessness and the gangs are just, you know, indiscriminate thugs? I agree, Your Honor. Many times there are, it is general instances, right? It is a general violence. But in this case, I think we look at the circumstantial evidence. And I think that here is where the immigration judge, the agency failed. They didn't look at the circumstantial evidence. So I think that if we look at that, in addition to the fact that these are attacks, not generally, this is specifically to the petitioner, to the petitioner's father, that we can say this goes past those generalized claims of fear. This is very specific. And I think that substantial evidence, we could say that substantial evidence does support that. Again, so I kind of want to look and make sure that we're seeing that, yes, the prior counsel did add these other elements. But specifically, the agency did find that core element, that core social group. And I think that we could focus the analysis on that. And that is cognizable. So that I think the agency then made an error indicating that the protected group, well, the protected group need only be a reason. And that motive is proven by that circumstantial evidence. So I don't think that when the immigration judge says that there's no evidence in the record that the cartel targeted the petitioner, I think that is not looking at the circumstantial evidence that was submitted. I do want to also talk about how the petitioner was denied a full and fair hearing. So in this hearing, we had a video conference between Boise and Salt Lake City. Was there ever a formal motion to change venue to Boise? No. If you look at the record towards the end, it's 152 and 153. After all of those interruptions, it was like eight in total in two and a half hours, the immigration judge ultimately said, we're shutting this down. We're going to call, we're going to do this by teleconference. And there was no indication to counsel, to petitioner's counsel. One of the things that's odd about this case is that the immigration judge is in Salt Lake City, which is not in this circuit. Correct. But your client was in Boise. But the judge announces at the beginning of the hearing, I'm conducting it from Salt Lake City. And then he issues a ruling where he cites only 10 circuit authority. And so that was why I was wondering, is there a formal order that transferred the venue to Boise so that it's clear that the venue is Boise? I mean, we had a similar case, exactly this problem where someone's in Boise. And in the early documents of the case, the immigration court for Boise was headquartered in Portland and then it got shifted to Salt Lake City. And you see that in the documents in this case. So I'm just wondering, is it clear that the venue was Boise? I'm fairly certain that the immigration judges do indicate the venue is Boise. I would have to refer to the record to be sure. Nobody's contested venue in this case. They typically do say venue is Boise. But I think that that... But it's odd that the judge seemed to think that he was in the 10th Circuit. Because he didn't cite any 9th Circuit cases. They're all 10th Circuit cases. He did. And this is, again, one reason why I think that we need to stress 9th Circuit law here. And I think that maybe there was that disconnect between the standards. I think it's kind of odd that the immigration courts have set themselves up so that they have courts that straddle circuits, which is very confusing. We are now back in Portland, being in Boise. But again, I do think that we do have that... We have so many interruptions in this hearing. Can you identify potential prejudice? I think the record is clear. There's a lot of technical difficulties. But what's the prejudice? So if we look at where the interruptions occurred, most of them occurred... Well, like three or four occurred during the petitioner's testimony. And then the rest, and I think it's the majority, occurred during DHS counsel's closing. I think that that's important because the petitioner's attorney was not afforded an opportunity to really understand what was being said. And then because the judge immediately foreclosed anything else, he said, we're going to a telephonic hearing and I'm going to issue a written decision, and basically told the petitioner's attorney, you understand that, correct? And did not give the petitioner's attorney an opportunity to maybe address the, maybe in a rebuttal closing argument, those issues that DHS counsel highlighted. I think that there's potential prejudice there. Maybe the attorney would have addressed the nexus, the changed circumstances, all of these issues that the judge... It was just a written ruling later.  How much later was it? Pardon me? How much later was it? I don't believe it was too much later, Your Honor. I would have to check the dates exactly. If counsel wanted to submit something further, couldn't counsel have submitted something further? Admittedly, he could have. But if you look at the record, the immigration judge basically foreclosed that option and indicated the record is closed. Lastly, I do want to touch on just the Board of Immigration Appeals not addressing the motion terminate. I mean, that's just antithetical just to the idea of jurisprudence. We have courts to be able to decide on issues. There was zero indication that the Board of Immigration Appeals even acknowledged that motion. They should have at least acknowledged it. There was nothing. And I think that that definitely demands remand. My time is nearly up. I do want to reserve some time for... All right. Thank you, counsel. We'll hear now from Mr. Morgan. Oh, Ms. Morgan. I'm sorry. You may proceed. Good morning, Your Honors. I'm Carmel Morgan on behalf of the respondent, the United States Attorney General. I first want to address the two 28J letters that the government submitted. The first dealt with a recent Ninth Circuit case, Ruiz, in which the court decided that the changed circumstances or extraordinary circumstances excuse for an untimely asylum application remains reviewable as a mixed question of fact and law. But the standard is deferential. The standard is deferential. I just wanted to point out that I want to be careful on behalf of the government to say that we're not withdrawing our argument. We would like to preserve that for appeal, but we recognize that in Ruiz, the court... We're bound by Ruiz. Correct. Yes, Your Honor. But you may want to take that up. Correct, Your Honor. With regard to the second 28J letter, there was a footnote in respondent's brief. There had been some question about the standard of review for a past persecution determination that has now been resolved very recently by the U.S. Supreme Court, and that is substantial evidence. I think we said in our brief it wouldn't have mattered what the standard was, but it is substantial evidence, and that issue has now been resolved. There are a number of issues in this... Can I just ask you, just out of my own curiosity, is it clear from the record that the venue is, in fact, Boise? I mean, the BIA cites Ninth Circuit decisions, but it really was striking that the IJ cites only 10. The IJ seemed to think that this was the case in the Tenth Circuit. Yeah, I think it's very clear from the case law that it's where the notice to appear issues and the case originates unless there's a motion to change, actually change venue. The venue originally was Boise. It was Portland, I think. Oh, it was Portland. Yes, but Portland or Boise, nobody's disputing that the correct law to apply in this case is Ninth Circuit law. Okay. All right. With regard to the untimely asylum application, it's the government's position that substantial evidence does support the agency's determination that the petitioner did not come forth with information sufficient to show a material change in circumstances that would impact the filing of his asylum application. It's a little unclear. The petitioner seemed to be making two arguments. One was that there was an increase in power among the Los Zetas gang. He also seemed to be making the argument before the board which the board addressed that the 2013 incident was what completely changed his outlook and made him want to apply for asylum. To the extent that he's relying on information in the record about changes in the strength of the gang, I don't think that the record supports that that's a material change when the petitioner was aware as far back as 1993 that the gang was appearing in his home village and was harassing young men. That wasn't a new circumstance. He even admits before the immigration judge that he understood that things were the same in his home village. With regard to the incident involving his father in 2013, he admits on the record that he doesn't know who the assailants were. So you can't tie that to a change in circumstances when it's unclear who assaulted his father or what the circumstance is for. His story changed a little bit or at least he added details. One of the added details about that incident was that his father was asked about his location. Where's Miguel? But it's unclear from that statement why they were looking for him. So I don't think that that incident and the board determined it was not material to a change or extraordinary circumstance. And therefore, substantial evidence does support the determination. Even setting that aside, nexus is a bigger problem for the petitioner in this case. The evidence just does not strongly support that there's a nexus to even the shortened So if we were to agree with you on the nexus point, would we even have to reach the timeliness issue? No, Your Honor, you wouldn't. Nexus is determinative of both asylum and withholding of removal in this case. On the nexus element, even if you consider the shortened version of a particular social group, and that would be the indigenous Mexican men, petitioner doesn't set forth any facts that would lead you to believe that's why he was approached for the first time in 1993 by the gang. There's no evidence that they asked him or mentioned his ethnic background. And if that second incident occurred, he seemed to say in his live testimony that that was the only incident, the 1993 one. But he did mention in his declaration there was a second incident some years later when he returned to his hometown. Again, they asked him for money. It's not clear at all that the record would support a finding that his indigenous ethnicity was related to why they were demanding money from him. And the same goes for the third incident, which occurred in 2013 when the petitioner was already in the United States. It can't go to past persecution because he was not present. That wouldn't be considered persecution of petitioner himself. If something dreadful, and it did, dreadful happened to his father, that might be relevant to future persecution. But here there's no evidence that his father was attacked based on his ethnicity or that those attackers wanted to pursue the petitioner in this case based on his ethnicity. And so substantial evidence in the record does support the immigration judge's finding that the evidence just simply is insufficient to show a nexus to one of the protected grounds. With regard to past persecution, the story changed somewhat there, too. Initially, he did not mention a death threat. I don't think he mentioned any death threats except to his father, perhaps. But even setting that aside, the agency seemed to credit his later testimony that he was threatened with death in 1993. But that was a very brief incident. And I think, depending on which version of his facts you look at, that they also asked him for money. It's not clear that that would rise to the level of persecution. Someone, I forget which of you mentioned isolated incidents, but these do seem to be isolated in time. The 1993 incident, many years later, I think 1998, he goes back to his hometown, and then again 2013 when he's not even present. But even together, considering all of the circumstances, cumulatively, they don't add up to a past persecution finding. With regard to cat protection, I think Petitioner almost conceded that there's really very little that would amount to substantial evidence in support of a torture claim in this case. That certainly is the government's position, that it's insufficient simply to show generalized poor country conditions. The sentence there that we see in the BIA's ruling is we also affirm as lacking clear error. The immigration judge is finding that the respondent did not establish that any future harm he would experience in Mexico would be by or with the consent or acquiescence, including the willful blindness of a government official. Is that sort of composite sentence? Is that just an acquiescence finding in your view, or does it also include a future harm finding? I read it as including both there, Your Honor. I mean, you have to have both to make a torture claim successful. So you read that as a BIA saying the standard is you have to show that there would be harm that would be with the acquiescence. And here, you fail that standard because any future harm that you might have shown wouldn't rise to the level. Yeah, I think that... Or wouldn't involve acquiescence, et cetera.  With regard to the interruptions, the government disagrees that any prejudice was shown. The petitioner hasn't come forward with specific evidence of what might have been missing, what was overlooked, and particularly with regard to Nexus, which is dispositive of the asylum and withholding claims. There's no identification of what the immigration judge failed to consider. The petitioner certainly was able to get out the facts of his case, and clearly the immigration judge considered them. The very end of the hearing, I read the record as showing that the parties had rested by the time that the immigration judge switched to the telephonic recitation at the end of the hearing. That issue specifically with regard to switching to the telephone was not raised before the board, and so the board didn't address it. But it doesn't appear that despite those few interruptions that the petitioner's testimony was somehow not coherent or understood. Certainly, counsel could have asked to please continue the hearing, let's not go forward, I'd like a chance for rebuttal or any of these things, and there's nothing reflected in the immigration judge at the hearing. It is unfortunate, I could not find in the administrative record that the board addressed the motion to terminate. So it does appear that that motion was unfortunately overlooked. However, at this time, it is very clear that under Bastid-Hernandez, a decision of this that jurisdiction does rest with the immigration court under these circumstances. Even though it was overlooked, and normally there'd be Chenery issues, here the absolute pointless futility of sending it back, which is an exception to Chenery, you think covers that. Yes, Your Honor, that is the government's position. And in addition, I think the fact that it's a jurisdictional issue and the court can always examine its jurisdiction is perhaps relevant here too. Correct, Your Honor. Please let me know if I haven't addressed any areas of concern, but if you have no further questions, the government will ask. I have one. Great. If Nexus takes care of withholding an asylum, does this issue of the failure to rule on a motion to terminate in any way undercut those grounds or the Nexus as a basis for ruling in your favor? It can't here, Your Honor, because it's just so perfectly clear that jurisdiction vested with the immigration court. So no, there wouldn't be any impact. So if there are no further... So the transcript we have in the record, is that prepared based on a recording of the matter? Yes, that's my understanding. But it isn't like a court reporter taking down in... No, no, there isn't a court reporter present. So this is just... So what we have here reflects what audio was captured. That is correct, Your Honor. Through the various means?  They don't prepare those transcripts unless there is an appeal, generally. Okay. So that's done after the fact. All right. Thank you, Counsel. Thank you, Your Honors. All right. We'll hear from both. Thank you, Your Honors. I want to take up the issue of the motion to terminate. And yes, this court in Bastida-Hernandez did address the underlying arguments in the petitioner's motion to terminate. But if we look at the concurrence in that motion to terminate, we see that these are culpable arguments. These are arguments that the concurrence indicated maybe the Supreme Court would later overturn and maybe indicate that one notice to appear, if it's complete, does control jurisdiction. So I think that given that there is somewhat of a culpable argument, the Board of Immigration Appeals should have at least addressed it. You're referring to Judge Friedland's concurrence? I believe so. We should at least be able to have that decision because this is, again, what we do with appeals. If there's an adverse decision that we take an issue with, we can address it in the courts higher up. And perhaps, as the concurrence indicated, the Supreme Court would address the notice to appear, given that the Supreme Court in both Pereira and Chavez was, again, very strict with the treatment of that notice to appear. So perhaps later on. I mean, immigration law changes all the time. It just depends on the day. So this is, I think, that we should at least get an articulated decision from the BIA on this motion. In addition, regarding the interruptions, you know, the interruptions, yes, did occur at the end. But reading the record, it does seem like, to me, the immigration court just completely foreclosed any other options. Just said, I'm going to issue an oral decision. Did not allow counsel to do anything more. And I think that could have been the argument to convince the court to rule otherwise. Thank you, Your Honors. All right. Thank you, counsel. The case just argued will be submitted. And the court will stand in recess for 10 minutes. All right.
judges: COLLINS, LEE, Fitzwater